Robert C. Schubert (No. 62684)
Amber L. Schubert (No. 278696)
Daniel L.M. Pulgram (No. 354569)
**Schubert Jonckheer & Kolbe LLP**
2001 Union Street, Suite 200
San Francisco, California 94123
Telephone:      (415) 788-4220
Facsimile:      (415) 788-0161
rschubert@sjk.law
aschubert@sjk.law
dpulgram@sjk.law

L. Timothy Fisher (No. 191626)
Brittany S. Scott (No. 327132)
Jenna L. Gavenman (No. 348510)
**Bursor & Fisher, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
ltfisher@bursor.com
bscott@bursor.com
jgavenman@bursor.com

*Co-Interim Class Counsel*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WAG HOTELS, INC. PET SAFETY LITIGATION<br><br>_____<br><br>This Document Relates To:<br>All Actions<br>_____ | Case No. 4:24-cv-01162-JST<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

---

**Consolidated Class Action Complaint; Case No. 4:24-cv-01162-JST**

1    Alison Wisdom, Jeffrey Wisdom, Michelle Shelton, Jessica Diamond, Jordan Williams,

2  Kerri Rosenberg, LaDonna Shuttleworth, Pauline Bell, and Jack Piper ("Plaintiffs") bring this

3  consumer class action against Wag Hotels, Inc. (the "Defendant," or the "company," "Wag," or

4  "Wag Hotels") for deceptive advertising, negligence, fraud, negligent misrepresentation, and

5  unjust enrichment. Plaintiffs' allegations are based upon personal knowledge as to their own acts

6  and upon their investigation, the investigation of counsel, and information and belief as to all other

7  matters. Plaintiffs, on behalf of themselves and all others similarly situated, allege:

8                                    **SUMMARY OF ACTION**

9        1.      Pet owners place tremendous trust and faith in commercial animal boarding

10  facilities to adequately care for their beloved pets. In fact, legislators throughout California have

11  resonated with this sentiment and implemented numerous statutes and local ordinances that impose

12  obligations on kennels and catteries to maintain safe, clean, and livable environments for

13  customers' pets. Simply put, animal boarding facilities must maintain *humane* conditions for pets.

14        2.      However, when animal boarding facilities prioritize profits over pet welfare and fail

15  to comply with commonsense and legislative requirements to provide safe and humane boarding

16  conditions, tragic outcomes can ensue.

17        3.      Wag Hotels—which purports to provide "premium" boarding, daycare, and

18  grooming services to dogs and cats at premium prices—is one such company that failed to

19  maintain a safe, clean, and habitable environment for customers' pets. Wag's negligence and

20  misconduct caused at least dozens of pets to contract life-threatening infections and other serious

21  health conditions. In some cases, these conditions have caused pets to experience lingering,

22  lifelong health issues.

23        4.      The company's systematic, pervasive, and longstanding neglect for its customers'

24  pets was disclosed to the public on August 15, 2023, when the *San Francisco Chronicle* published

25  findings from its in-depth investigation of the company's practices in an article titled *"Filthy pets.*

26  *An amputated leg. Inside alleged 'absolute neglect' at Wag Hotels*"[1] (the "Chronicle Article"). The

27

28  _____
[1] Melissa Newcomb, *Filthy pets. An amputated leg. Inside alleged 'absolute neglect' at Wag Hotels,* SAN FRANCISCO CHRONICLE (Aug. 15, 2023), https://www.sfchronicle.com/sf/article/wag-luxury-pet-hotel-17769312.php.

article detailed horrific conditions that have plagued Wag's California facilities for years. Importantly, many of the allegations were corroborated by current and former Wag employees.

5.     Among the allegations included in the Chronicle Article were instances of overcrowded group play areas tainted by urine, feces, and blood; pets being left to starve or not being fed until hours after their scheduled feeding time; a failure to sanitize or clean kennels and group play areas on a consistent basis; medical neglect by staff members when pets displayed clear signs of pain or discomfort; understaffed facilities; and Wag's common practice of hiring untrained staff members who had little to no experience in animal care.

6.     Plaintiffs Wisdoms' dog, Paige, was the victim of Wag's neglect, including many of the conditions described above. During a nine-day stay at Wag's Redwood City facility in September 2021, Paige contracted a flesh-eating bacterial infection known as *necrotizing fasciitis*, which spread rapidly and required immediate treatment. Plaintiffs believe that the infection was caused by the unsanitary conditions at Wag's boarding facility. Due to the infection, Paige was eventually forced to undergo surgery to amputate one of her legs. Paige is pictured below:



7.      She has since recovered from her surgery and continues to be a source of joy to her owners, but Paige and her owners must face the tough reality of managing the lingering health issues connected to her amputation.

8.      Plaintiff Shelton's dog, Mercedes, was also the victim of Wag's neglect. Following a recent stay at Wag's South Bay/Carson facility in September 2023, Plaintiff Shelton discovered that Mercedes was scratching herself an unusual amount and had open sores throughout her body that were not present prior to boarding her at Wag. Additionally, despite paying for a suite, which included access to a live video stream of Mercedes at Wag during her stay, Mercedes was placed in a room without a camera, and Plaintiff Shelton was not provided access to any live stream. Plaintiff Shelton could therefore not determine how Mercedes was treated during her stay.

9.      Importantly, Paige, Mercedes, and their owners were hardly alone in their experiences. Plaintiffs Jessica Diamond, Jordan Williams, Kerri Rosenberg, LaDonna Shuttleworth, Pauline Bell, and Jack Piper, among many others, experienced similar deception and neglect in relation to the care provided to their pets.

10.     Indeed, the Chronicle Article references several tragic and heartbreaking stories from pet owners whose trust in Wag's services and staff quickly turned to shock and anger when their pets returned from Wag's care with bruises, cuts, infections, urine and feces-covered bodies, and other serious health conditions.

11.     The sheer number of complaints from Wag customers and employees throughout the years indicates that these instances of neglect and abuse are not one-off occurrences. Rather, they are the product of systemic issues related to Wag's lax and negligent policies and practices.

12.     Based on the alarming allegations noted above, the San Francisco Animal Care & Control, the City's animal welfare authority, initiated an investigation into the company's San Francisco facility. The agency confirmed to news outlets that it conducted an inspection of Wag's San Francisco premises. Upon information and belief, the agency's investigation is ongoing.

13.     Plaintiffs bring their claims individually and on behalf of a nationwide Class and California Subclass of consumers who used Wag's services. As evidenced by the allegations in this complaint, Defendant has committed negligence, made negligent misrepresentations, was unjustly

enriched, and violated California's consumer protection and false advertising laws, including the False Advertising Law (Bus. & Prof. Code §§ 17500 *et seq.*), the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*), and the Consumers Legal Remedies Act (Civ. Code §§ 1750 *et seq.*), by failing to implement procedures, policies, and other oversight mechanisms to ensure the well-being of customers' pets and intentionally utilizing deceptive trade practices and false and misleading claims to sell its services.

## PARTIES

**Plaintiffs Alison and Jeffrey Wisdom**

14.     Plaintiff Alison Wisdom is a citizen of California and a resident of Chino, California.

15.     Plaintiff Jeffrey Wisdom is a citizen of California and a resident of Chino, California.

16.     Alison and Jeffrey's Labrador, Paige, stayed at Wag's Redwood City facility for nine days between September 12, 2021 and September 20, 2021. While there, Paige contracted a life-threatening bacterial infection known as *necrotizing fasciitis* and was eventually forced to undergo a surgery to amputate one of her legs.

17.     On September 20, 2021, Alison and Jeffrey received a text and several voicemails from employees at Wag's Redwood City facility informing them that Paige was displaying a strong limp, and Wag was going to schedule an emergency appointment with a veterinary provider. In a voicemail, Wag stated that Paige was lethargic, a major red flag.

18.     That same day, Wag took Paige to a veterinary clinic but only had a technician observe Paige in the lobby of the facility, instead of waiting to see a veterinarian. The technician observed that Paige was suffering from a swollen right hind paw that appeared to be getting progressively worse. Paige was scheduled for a more comprehensive appointment the next day.

19.     When Alison and Jeffrey picked up Paige from Wag's Redwood City facility later that evening, it was clear that Paige's condition was worsening: her paw was massively swollen and she had a fever.

20.     The next day, Alison and Jeffrey took Paige to see a vet at their local urgent care facility. There, the vets at the facility conducted testing on cultures extracted from Paige's paw and determined that Paige was suffering from a bacterial infection resulting in *necrotizing fasciitis*. The culture showed six different strains of bacteria.

21.     Over the next few days, Paige's condition continued to decline. Despite aggressive efforts to combat the infection, it continued to spread. Paige's bacterial infection is depicted below:



22.     On September 24, 2021, Alison and Jeffrey were told that Paige's infected paw was no longer viable, and it was recommended that she undergo an amputation of her entire right hind leg in order to stem the infection. After careful consideration, Alison and Jeffrey decided to comply with the vet's recommendation. Paige's right hind leg was amputated on September 24, 2021.

23.     After the amputation, Paige remained in the ICU for several days as her health remained in a precarious state. After she was discharged from the ICU, Paige continued to require intensive supervisory care.

24.     Alison and Jeffrey incurred over $30,000 in medical bills as a result of the bacterial infection that Paige contracted during her stay at Wag.

25.     Soon after Paige's surgery, Alison and Jeffrey reached out to Wag to alert the company about the conditions at its facility that caused Paige's sudden bacterial infection and to request more information on Wag's operations. As part of their communications to Wag, Alison and Jeffrey asked Wag to disclose its policies and procedures concerning sanitation, staffing, recordkeeping, and general pet welfare. Wag refused to provide substantive responses to Alison and Jeffrey's questions.

26.     In selecting boarding facilities, Alison and Jeffrey relied on Wag's representations assuring customers of its dedication to hygiene, safety, and pet welfare. Alison and Jeffrey trusted Wag to take care of Paige and were ultimately misled and harmed by Wag's representations.

**Plaintiff Michelle Shelton**

27.     Plaintiff Michelle Shelton is a citizen of California and a resident of Long Beach, California.

28.     Plaintiff Michelle Shelton's Terrier Chihuahua Mix, Mercedes, stayed at Wag's South Bay/Carson facility for 4 days between September 1, 2023 and September 4, 2023. Immediately following Mercedes's stay, Shelton discovered that Mercedes was scratching herself an unusual amount and had open sores throughout her body that were not present prior to boarding her at Wag. Mercedes's skin irritation and flea bites from her stay at Wag are shown below:

 

29.     Additionally, even though Shelton paid Wag for a suite, which included claimed to provide access to a live video stream of Mercedes during her stay, Wag initially placed Mercedes in a room without a camera. Despite repeated attempts, Mercedes was not placed in a room with a camera until following day. During that time, Shelton could therefore not determine how Mercedes was treated while at Wag.

30.     In selecting boarding facilities, Shelton relied on Wag's representations assuring customers of its dedication to hygiene, safety, and pet welfare. Shelton trusted Wag to take care of Mercedes and was ultimately misled and harmed by Wag's representations.

**Plaintiff Jessica Diamond**

31.     Plaintiff Jessica Diamond is a citizen of California and a resident of Oakland, California.

32.     Plaintiff Jessica Diamond entrusted her pet dog, Ziggy, to Wag Hotels' San Francisco facility on multiple occasions between June of 2022 and May of 2023. Ziggy is depicted below:



33.     During Ziggy's stays at Wag Hotels, they were supposed to be placed in the "Doggy Day Care." At first Ziggy was a member of, and Plaintiff Diamond paid for her to be in, the "All-day play group" of dogs. Plaintiff Diamond had also pre-paid for 20 "all-day play passes."

34.     Eventually, Plaintiff Diamond learned that Wag Hotels had been taking Ziggy out of the all-day play group and putting her by herself for the entire day (all day stay), even though this was not the service Plaintiff Diamond paid for.

35.     Plaintiff Diamond asked for a refund of the unused "all-day play passes" but Wag Hotels denied the refund even though it could not or would not honor them. Instead, Wag proposed Ziggy be switched to a boarding style system where Ziggy would be left inside but would get at least 1 hour outside the room each day. However, a staff member later informed Plaintiff Diamond that Ziggy was not consistently receiving even this promised 1 hour of outside time.

36.     At this time Ziggy began showing uncharacteristic behavior including relieving herself in Plaintiff's car upon pickup and showing extreme signs of anxiety and stress which worsened until Plaintiff ended her patronage with Wag Hotels in May of 2023.

37.     In selecting boarding/daycare facilities, Diamond relied on Wag's representations of the type of service which would be provided to her dog and its representations of its dedication to hygiene, safety, and pet welfare. Diamond trusted Wag to take care of Ziggy and was ultimately misled and harmed by Wag's representations.

**Plaintiff Jordan Williams**

38.     Plaintiff Jordan Williams is a citizen of California and a resident of San Francisco, California.

39.     Plaintiff Jordan Williams placed his pet, Millie, in day care at Wag Hotels' San Francisco facility on various occasions between January of 2021 and January of 2024. Pictures of Millie are below



40.     Several times, upon picking Millie up from Wag Hotels' day care, Williams noticed that Millie seemed to be unusually hungry and underfed. Moreover, even though Williams paid for access to live video footage of Millie during her days in Wag Hotels, he was repeatedly not able to access this footage. On one occasion Williams paid an extra fee for Millie's nails to be trimmed during her stay, but after her stay and upon inspecting her nails, she realized they had not been trimmed. Williams never received a refund for this extra cost or the other paid for benefits which were not provided.

41.     In selecting boarding/daycare facilities, Williams relied upon Wag's representations of the type of service which would be provided and its representations of its dedication to hygiene, safety, and pet welfare. Williams trusted Wag to take care of Millie and was ultimately misled and harmed by Wag's representations.

1

**Plaintiff Kerri Rosenberg**

2    42.    Plaintiff Kerri Rosenberg is a citizen of New Hampshire and a resident of Epping,

3    New Hampshire. At the time she was harmed by Wag she lived in Mountain View, California.

4    43.    Plaintiff Kerri Rosenberg placed her pet, Jenny, in the care of Wag Hotels'

5    Redwood City facility on May 3, 2023. Pictures of Jenny are shown below.

6



7

8

9

10

11

12

13

14

15

16

17

18

19

20    44.    When Rosenberg dropped off Jenny at Wag Hotels, Rosenberg instructed the staff

21    to call her right away if they noticed Jenny show any signs of serious illness.

22    45.    Jenny subsequently began to show signs of serious illness – she had a significant

23    vomiting episode and became pale and extremely lethargic.  However, although Jenny first showed

24    these signs of illness at 10:00 AM, Plaintiff Rosenberg was not notified until approximately 1:45

25    PM. At this time, Jenny was finally taken to the vet hospital. Plaintiff Rosenberg immediately left

26    her place of work to make her way to the vet hospital.

27

28

46.     Jenny died before Rosenberg could arrive at the hospital. The veterinarian informed Rosenberg that a lifesaving surgical procedure may have been possible if Jenny had been brought to the hospital sooner.

47.     Plaintiff Rosenberg later learned Wag Hotels had taken a photograph of Jenny the day she died. Wag Hotels sent this picture to Plaintiff at 4:01 PM on May 3, 2023 with the subject "Memory for your pet's stay." That photograph is below.



48.     In selecting boarding/daycare facilities, Rosenberg relied upon Wag's representations of the type of service which would be provided and its representations of its dedication to hygiene, safety, and pet welfare. Rosenberg trusted Wag to take care of Jenny and was ultimately misled and harmed by Wag's representations, including through the death of her pet Jenny. But for Wag's false and negligent misrepresentations about the level of care they could

1  provide, Jenny's life might have been saved and, *at minimum*, Plaintiff Rosenberg would have

2  been able to be present when Jenny passed.

3  **Plaintiff LaDonna Shuttleworth**

4  49.    Plaintiff LaDonna Shuttleworth is a citizen of California and a resident of Oakland,

5  California. She used Wag Hotel's services for her pet dog, Ziggy. Pictures of Ziggy are below:



21  50.    Plaintiff LaDonna Shuttleworth dropped her pet, Ziggy, off at Wag Hotels' Oakland

22  facility on May 7, 2023 for a one day overnight stay. The staff advised that Ziggy would be

23  upgraded to a private room because standard rooms were not available.

24  51.    When Plaintiff Shuttleworth picked Ziggy up on May 8, 2023, Ziggy was

25  noticeably lethargic. While walking Ziggy later that day, Plaintiff Shuttleworth noticed blood in

26  Ziggy's stool. Ms. Shuttleworth called her vet who advised to check on Ziggy in the morning. By

27  morning, the next day, Ziggy was dead.

28

52.     Plaintiff Shuttleworth was not informed of Ziggy's lethargic behavior nor of the worrisome symptoms they exhibited like blood in stool and urine.

53.     Plaintiff Shuttleworth relied upon Wag's representations of the types of services it would provide and its representations of its dedication to hygiene, safety, and pet welfare. Shuttleworth entrusted Ziggy with Wag as a result of these representations and was ultimately harmed as a result.

**Plaintiff Pauline Bell**

54.     Plaintiff Pauline Bell is a citizen of California and a resident of San Francisco, California.

55.     Plaintiff Pauline Bell dropped off her pet dog, Shane, at Wag Hotels' San Francisco facility at the end of 2019 before heading on a trip. When Plaintiff Bell dropped Shane off at Wag Hotels for boarding he was in very good health and was not showing any signs of illness. He was also not an elderly dog. A picture of Shane is below:



56.     During her trip, Plaintiff Bell received a call from Wag in late December informing her that Shane had died. Wag Hotels did not provide Bell with any explanation for how Shane died in its care. She later picked up his ashes from the pet cemetery on January 2, 2020.

57.     Plaintiff Bell relied upon Wag's representations of the types of services it would provide and its representations of its dedication to hygiene, safety, and pet welfare. Bell entrusted Shane with Wag as a result of these representations and was ultimately harmed as a result.

**Plaintiff Jack Piper**

58.     Plaintiff Jack Piper is a citizen of California and a resident of San Francisco, California.

59.     Plaintiff Jack Piper entrusted Defendant with the care of his four-year old Pitbull Shepherd Mix, Posie, pictured below:

60.     Relevant here, Mr. Piper purchased a boarding stay from Defendant for Posie between December 26, 2020 and January 2, 2021 at Defendant's San Francisco facility.  Mr. Piper



purchased a "Large Deluxe Suite+," a "Burrow Bed+," a "Memory Foam Bed+," a "Deluxe Suite Option 3+," and "Nail Trim+" for Posie's stay.  Prior to purchasing Defendant's boarding stay for Posie, Mr. Piper reviewed Defendant's marketing and advertising and saw the false and misleading claims that, among other things, Posie would receive safe, comfortable, sanitary, and luxurious care throughout her stay.

61.     During Posie's stay, despite Mr. Piper's purchase of a suite, Posie was isolated in a different room—alone and crying—for an hour, during which Mr. Piper was able to watch Posie's suffering through a camera feed, unable to help or comfort his dog.  One of Defendant's employees told Mr. Piper that this isolation was because of an argument with another young dog, but Mr. Piper was not aware that any isolation would occur outside the deluxe accommodations he purchased for Posie.  When Mr. Piper picked Posie up from Defendant's facility, Posie had developed a limp.  Despite having been an active dog prior to her stay, Posie continues to suffer

from her limp and has yet to make a full recovery.  As such, Defendant did not provide safe, comfortable, or sanitary, or luxurious care for Posie during her stay, and failed to provide each of Mr. Piper's purchased accommodations.

62.     As a direct result of Defendant's material representations, warranties, and omissions regarding the standard of care for pets boarded in Wag Hotel facilities, Mr. Piper and Posie suffered, and continue to suffer, lasting repercussions from trusting Defendant's false promises.

**Defendant Wag Hotels, Inc.**

63.     Defendant Wag Hotels, Inc. is a Delaware corporation with its headquarters located at 1759 Enterprise Boulevard, West Sacramento, CA 95691.

64.     Wag offers premium boarding, daycare, and grooming services for cats and dogs. The company owns and operates nine facilities in the following cities throughout California: Oakland, Redwood City, Sacramento, San Francisco, Santa Clara, Hollywood, San Diego, Carson, and Santa Monica. Wag also owns and operates six facilities in cities outside of California: one facility in Denver, Colorado; two facilities in Texas (one in Dallas/Fort Worth and one in Richardson), and three facilities in Chicago, Illinois (in Lincoln Park, West Loop, and O'Hare).

**JURISDICTION AND VENUE**

65.     This Court has subject matter jurisdiction and diversity jurisdiction over this action under the Class Action Fairness Act 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The putative class contains thousands of members, many of whom have citizenship diverse from Wag Hotels.

66.     Venue is appropriate because Wag Hotels conducts substantial business in this district, and the majority of the named Plaintiffs suffered harm within this district. Specifically, the transactions of a substantial portion thereof occurred in this district. Defendant also previously sought removal to this district.

**RELEVANT FACTUAL ALLEGATIONS**

**A.     Wag markets itself as a premium luxury pet care service dedicated to providing an attentive, clean, and safe environment for pets.**

67.     When pet owners need to be away from home, some turn to pet boarding for proper care for their animals.  Pet boarding is taking your dog or cat to a facility away from home for an

overnight stay or longer.  These lodging facilities are often called pet hotels, pet boarding facilities, or boarding kennels, and can range from traditional boarding kennels to veterinary facilities to pet resorts.[2]

68.     Pet resorts are a much fancier version of a traditional boarding kennel, and they typically offer cage-free rooms with comfortable furniture, more amenities and services, and guaranteed extra interaction with pets including with both well trained human staff members and other pets. Pet hotels/resorts also often offer different play areas, water features for pets to play in, on-site grooming, pet specific entertainment opportunities, customizable itineraries for pet stays, and webcams in pet rooms for owners to monitor their pets while separated.[3]

69.     Wag describes itself as the "ultimate stay and play resort" that offers "luxury boarding accommodations" along with grooming and behavioral training services. It also charges premium prices.

70.     Customers who use the company's boarding services can opt for various lodging options ranging from small private rooms to more luxurious "suites." Among other things, it describes its boarding services as follows on its website (by hovering over the boarding icon):



71.     The company understands the importance of creating a safe, attentive, and clean environment for customers' pets, as evidenced by representations displayed throughout its website that uplift the company's claimed dedication to pet welfare.

---

[2] *See* Chewy Editorial, "The Pros and Cons of Pet Boarding and Pet sitting," bechewy (November 3, 2020) https://be.chewy.com/pros-and-cons-of-pet-boarding-and-pet-sitting/.

[3] *See* Very Important Paws, "The Difference Between a Dog Hotel and a Traditional Boarding Kennel," https://www.veryimportantpaws.com/difference-between-dog-hotel-and-traditional-boarding-kennel/ (last visited September 28, 2023).

72.     Wag repeatedly assures customers of its dedication to providing a safe and clean environment for pets. For example, customers are greeted with the following representations on the homepage of Wag's website: "SAFETY, CLEANLIENESS & FUN ARE ALWAYS #1[,]" and the company assures customers that its facilities are "[b]uilt with safety, comfort, and cleanliness in mind[.]"[4]



73.     Wag markets its facilities as the "ultimate in fun, safety, and convenience for cats and dogs." On the webpages for each of its facilities, Wag represents that its facilities are safe and clean for pets and that the company prioritizes pets' health, safety, and comfort. For example, the Redwood City facility purports to prioritize pets' "health, safety, and comfort"; to adhere to "industry-leading sanitation procedures"; and to offer "regular room refreshing and cleaning" for pets who stay in private boarding facilities.[5] For example, the below box represents a typical representation which would be made on Wag Hotel's website:

74.     Furthermore, Wag further represents that its facilities are well-staffed to provide 24/7 care to customers' pets, which is a comforting and appealing perk for anxious pet owners.

75.     For example, Wag's homepage touts that it offers "PET CARE YOU CAN COUNT ON" and boasts that its facilities are "staffed 24/7" and that "you can always count on us to be there when you need us."[6]

---

[4] *See* https://www.waghotels.com.

[5] *See* https://www.waghotels.com/oakland/boarding/; https://www.waghotels.com/sacramento/boarding/; https://www.waghotels.com/san-francisco/boarding/; https://www.waghotels.com/santa-clara/boarding/; https://www.waghotels.com/hollywood/boarding/; https://www.waghotels.com/san-diego/boarding/; https://www.waghotels.com/south-bay-carson/boarding/; https://www.waghotels.com/santa-monica/boarding/.

[6] *See* https://www.waghotels.com.

76.     Additional representations assuring customers of competent 24/7 staffing are included throughout the company's facility-specific webpages. For example, the webpage for the Oakland facility boasts "[o]ur staff is on site 24/7/365 making sure each pet gets the love and attention they deserve."[7] Identical or substantially similar representations touting the company's dedication to well-staffed and competently staffed facilities are featured on the webpages for the eight additional Wag facilities throughout California.[8]

77.     Moreover, customers paying for private suites are assured that they will have access to a 24/7 livestream connected to their pet's suite, which gives customers comfort in knowing that they can check-in on their pets at any time. Customers are further assured that they will have daytime access to the "WagCam," which is a livestream connected to the facilities' group play areas.

78.     Wag's "Daycare" services are likewise described as providing individualized care which is tailored to individual dogs. Their website currently represents their daycare services as follows (by hovering over the daycare icon on the screen).



79.     Wag's representation about its daycare services is misleading. In fact, Wag had nowhere near the staff, nor the training, to provide the individualized and tailored fit programs it promised.

80.     Customers choose to entrust Wag to take care of their pets based on the representations described above that convey to consumers that Wag will provide a safe and clean luxury lodging and daycare experience for their pets.

---

[7] https://www.waghotels.com/oakland/.

[8] *See* https://www.waghotels.com/redwood-city/; https://www.waghotels.com/sacramento/; https://www.waghotels.com/san-francisco/; https://www.waghotels.com/hollywood/; https://www.waghotels.com/san-diego/; https://www.waghotels.com/south-bay-carson/; https://www.waghotels.com/santa-monica/.

**B.     Contrary to Wag's representations, the company has not prioritized pet welfare.**

81.     Over the years, reports have emerged that, contrary to Wag's purported dedication to pet welfare, the company's nine California facilities are plagued by rampant neglect and abuse.

82.     According to the findings published in the Chronicle Article, Wag's facilities are egregiously unclean and unsanitary. Several pet owners stated that their dogs smelled like urine and feces when they picked them up from Wag's care. A former employee from the company's San Francisco facility disclosed that managers would often ask staff members to bathe customers' pets before returning them to their owners to rid the pets of the dirt and filth picked up from the group play areas. Other former employees from the San Francisco facility stated that "[d]ogs will be basically laying in pee all the time," and noted that they frequently saw rodents in the facility. A former employee of the Oakland facility described frequent instances of gnats swarming the sewage pipes. Furthermore, a photo from Wag's Redwood City location displayed a bowl of cat food that had become moldy.

83.     Moreover, individual kennels, promoted as "rooms" and "suites," presented serious sanitation concerns. Current and former employees reported that staff would not clean excrement for hours and animals could be found lying in or consuming it.

84.     Wag's failure to provide a clean and safe environment for customers' pets is connected to the company's staffing issues.

85.     Wag facilities are understaffed and staffed by employees with little to no experience with animal welfare. Of the twenty-nine current and former employees contacted as part of the *San Francisco Chronicle*'s investigation, many of these individuals confirmed that they were hired with little to no experience in animal welfare and were provided inadequate training after joining the company.

86.     Current and former employees have stated that the boarding facilities were understaffed to the point that providing a safe and sanitary experience for customers' pets was nearly impossible. In fact, a former employee from the San Francisco facility flagged the

concerning lack of oversight in the facility's group play areas and noted that just one staff member was often responsible for the welfare of more than fifty dogs.

87.     Reviews from former and current employees featured on Wag's 'Glassdoor' page corroborate the narrative that the company's facilities were grossly understaffed. For example, a former Guest Services employee at the Santa Clara facility wrote that the facility had "dangerously large play group sizes for 1 handler[.]" A former Pet Hotel Associate from the company's Los Angeles facility wrote "[t]oo many dogs in the playroom for one person to take care of." A former Client Service Representative at Wag's Oakland facility wrote "[t]hey are also usually understaffed, and new hires typically do not stay long."

88.     The company's failures to properly staff its facilities, to hire adequately experienced employees or train new hires, and to oversee the hygiene of its facilities, collectively created the circumstances that caused customers' pets to experience abuse and neglect.

89.     For example, pets were left to starve or fed well past their scheduled feeding times. One customer from the San Francisco facility kept tabs on her dog through Wag's livestream service and saw her dog crying out for food for hours. Her dog was eventually fed 2-3 hours past his scheduled feeding time.

90.     Another customer at the company's Oakland facility provided a bag full of food for her dog when she dropped off her pet. When she returned to pick up her dog later that day, staff members informed her that they had lost the bag containing the food. The bag was eventually found, and the food was untouched. The staff members admitted that they had no records confirming that her dog had been fed.

91.     Several former and current employees interviewed by Chronicle journalists confirmed that Wag's facilities were so understaffed and overworked that it was not uncommon for employees to miss providing meals and medications.

92.     Moreover, the unsanitary and unsafe conditions caused several pets to develop injuries and health conditions, but staff members were not able to give these pets the necessary care and attention they deserved.

93.     A customer using Wag's Hollywood facility stated that when he picked up his bulldog, Brutus, he noticed that Brutus could barely walk because his foot pads had been badly damaged. Brutus's injury took weeks to heal, and his owner spent hundreds of dollars in vet bills. Believing that this might be a one-off occurrence, Brutus's owner took him back to the Hollywood facility nearly a year later, and Brutus once again returned from the company's care with damaged foot pads.

94.     Another customer stated that staff members at the San Francisco facility forgot to remove her dog's back brace, even though she had instructed them to do so, and the brace had sliced the dog's skin and created painful wounds.

95.     Plaintiffs Wisdom's dog, Paige, contracted a serious bacterial infection from the unsanitary conditions at the Redwood City facility and was eventually forced to amputate one of her legs. Plaintiff Shelton's dog, Mercedes, developed open sores throughout her body from the conditions at Wag's South Bay/Carson facility.

96.     Defendant's failures even caused injury to staff members. On June 13, 2019, a pit bull mauled and attacked four employees at the company's Santa Clara facility. A former employee who was injured in the incident, Taylor Soetje, stated that she walked into a play area to the sight of a pit bull dragging another employee by her ankle. Soetje disclosed that she had never received proper training on how to handle such situations and decided to grab the attacking dog by its hind legs. The dog then attacked her and proceeded to attack two other employees who tried to help. Other Wag Hotels employees have also indicated highly substandard or incorrect training practices.

97.     Importantly, when Soetje returned to work months later, she was disappointed to find that Wag had not implemented any significant policy changes or safety protocols to prevent similar traumatic incidents in the future.

98.     As alleged above, Wag misrepresented its dedication to pet welfare. Indeed, the company's failure to prioritize pet welfare caused grave harm to many customers' pets.

**C.      The problems with pet welfare at Wag are even worse than publicly known.**

99.      Based on Plaintiffs' counsel investigation into the neglect and abuse occurring at Wag's facilities in California, Plaintiffs, on information and belief, further allege that Wag's problems with pet welfare may be even worse than publicly known.

100.      Current and former employees at Wag's facilities have revealed that:

a)      Many pets do not receive blankets and are left in their kennels with no bedding to sleep on, even though customers paid for these blankets.

b)      Many pets are frequently served the wrong food or the wrong amount of food, and there is no system to record if and when pets are fed. This neglect results in uneaten food and significant dietary problems.

c)      Wag's facilities are chronically understaffed. Wag generally has only 1-2 staff members overseeing approximately 60 to 200 pets (and sometimes as many as 300 pets during the holidays). Because of this inadequate staffing, pets' "rooms" and "suites" are frequently not cleaned by staff, resulting in unsanitary living conditions, including kennels being flooded with animal waste.

d)      Wag's facilities are routinely heavily overbooked, especially during the holidays. Wag will often not provide customers with paid for services and will lie to cover this up. For example, a customer may pay extra for an individual "private" room or "suite" for their dog, but Wag would put multiple dogs in the room and separate them with dividers—substantially increasing the stress for the dogs while providing less space than promised. Secret double-booking during holidays is ordinary practice.

e)      Training for Wag staff is wholly inadequate. Training is primarily conducted through online videos, with one day of on-the-job training at most. These videos do not adequately prepare employees for properly caring for pet welfare.

f)      Managers frequently ignore the concerns of Wag's staff about inadequate conditions, staffing, and training. Wag has failed to properly investigate the claims raised by its employees, customers, and the general public. Pets and employees have repeatedly been injured

while at Wat Hotels. Wag would often hide or destroy paperwork related to people or pets who were injured.

g)      Despite Wag's representations, there is no meaningful assessment of dog behavior that impacts the groups the dogs are placed in. Large dogs will be placed in "big dog" groups and small dogs will be placed in "small dog" groups. On some occasions large dogs who had repeatedly bitten other dogs or people would be placed back into large groups of pets despite concerns from staff.

h)      Specifically, some dogs who had been "Red carded" and were supposed to never be allowed back at Wag due to biting people and other dogs were repeatedly allowed to come back due to Wag's need for revenue.

i)      Employees would frequently write identical "report cards" for what happened to animals under Wag's care or would otherwise make up what happened to the pets, while representing to owners that the "report cards" accurately reflected the pet's experience. Sometimes new dogs would be attacked on their first day and would then be placed in isolation for the remainder of the visit, without the guest ever knowing.

j)      Some Wag employees would not actually clean the rooms and would leave the dogs in filth for extended periods of time or would disconnect or turn around cameras to hide their mistreatment of animals. Other employees might throw the dogs around or behave unnecessarily roughly with them. According to one employee who was interviewed, almost every day or every other day a dog would be injured at Wag. According to this employee the "large dog" All Day Play group was especially dangerous.

k)      Wag Hotels employees who raised concerns about the health and welfare of the dogs or the adequacy of their training would be reprimanded, including with having their hours cut or getting fired, and were generally retaliated against as part of Wag's attempts to cover up their mistreatment of animals.

l)      Wag Hotels did not have an effective means of tracking medical issues which the dogs might have or instructions specific for the pets. For example, medical notes might be kept in the dog's "room" so the employee watching the pet in all-day play or transporting them

to and from the room would not have any knowledge of the medical issues. Moreover, dogs who were supposed to receive special care, including those with medical or anxiety issues, were especially at risk. The "Special Care" unit in particular was extremely short staffed and according to at least one employee the rooms which were supposed to be used for "special care" were often given to other dogs, forcing employees to keep dogs in meeting or break rooms. Dogs would sometimes not get their medications, and their rooms would not always be cleaned in a timely way.

m)      Customers would generally only be told about pet injuries or medical situations when the pet had to go to the emergency room. Sometimes Wag would play off injuries, such as falsely claiming that "the dog was limping when they got here." The general practice at Wag was to not pay for any vet bills.

**C.      Wag's corporate leaders had notice of the neglect and abuse at its facilities for years but failed to act.**

101.    Wag's management knew or should have known of the rampant animal abuse and neglect at the company's facilities.

102.    First and foremost, the company has been hit with administrative fines and legal actions related to its labor practices and workplace conditions.

103.    In response to the traumatic dog mauling attack described above at the company's Santa Clara facility, OSHA fined Wag Hotels $18,000 for a "serious" violation of safety standards.

104.    Moreover, documents shared with Chronicle journalists reveal that Wag had been involved in several suits involving workers compensation violations and labor law violations. In recent years, Wag has reached settlements with its employees concerning allegations of improper meal and rest periods, uncompensated off-the-clock work, and the denial of mandatory breaks for those with disabilities.

105.    Former managers and directors have raised red flags concerning the company's staffing issues for years, but the company's leaders have refused to address these issues for financial reasons.

106.    In fact, eight of the current and former employees interviewed by the Chronicle revealed that they had asked company leadership to implement changes to ensure the welfare of

customers' pets, but management was not receptive to these ideas. Kris Kates, a former director of behavior and training for Wag between 2013 and 2017 described several conversations over the years with Wag's corporate leaders about improving new hire trainings and ensuring that the company's facilities were adequately staffed. Kates eventually raised these issues with Michael Griggs, Wag's COO, but he told her that her proposed changes were too costly for the business.

107.    Similarly, Aubrey Sanders, the former head of training at the Oakland facility, said that months before the dog-mauling incident at the Santa Clara facility, she had proposed to Griggs training programs that would address the prevention and de-escalation of fights between dogs. However, like Kates, she was told that such trainings were a waste of time and money.

108.    Moreover, on information and belief, Wag's employees actively monitored online feedback websites, such as Google review and Yelp, which included a number of health and safety-related complaints concerning their facilities that were raised by customers. Wag also offered inducements to customers who posted negative reviews to improve their reviews, providing further evidence that Wag understood that the conditions at their facilities were inadequate, unsanitary, and unsafe.

109.    The allegations described above illustrate that Wag's leaders had notice of the egregious conditions within the company's California facilities, but ultimately decided to prioritize the profitability of the company over pet welfare.

**D.    Wag's conduct is inconsistent with the standards set forth in state and local laws governing the conditions at animal boarding facilities.**

110.    The standards and conditions required to operate commercial pet boarding facilities are outlined in several state and local laws. Wag's conduct, as alleged above, is inconsistent with the standards set forth by California law.

111.    In 2017, the California Legislature enacted the Pet Boarding Facilities Law ("PBFL"), Cal. Health & Saf. Code §§ 122380, *et seq.*, with intent to "establish procedures for the care and maintenance of pets boarded at a pet boarding facility, including, but not limited to, sanitation, provision of enrichment for the pet, health of the pet, and safety."  2016 Cal. Legis. Serv. Ch. 364 (S.B. 945).  The PBFL establishes responsibilities for pet boarding facility operators,

enclosure standards, animal care requirements, notice to owner requirements, and penalties for violating any section of the law, among other things.  Cal. Health & Saf. Code §§ 122380, *et seq.*

112.    For example, Section 122383 of the PBFL provides that a "pet boarding facility operator shall comply with all of the following animal care requirements," among many others:

    (a)    House only one pet at a time in an enclosure unless otherwise consented to by the owner.

    (b)    Observe each pet as necessary, but no less than once every 24 hours, in order to recognize the signs of sickness, injury, or distress, and in order to ensure the pet, food, and waste or debris is removed as necessary to prevent contamination or injury.

    (c)    Provide each pet with nutritious food in quantities and at intervals suitable for that pet.

    (d)    Maintain and abide by written policies and procedures that address animal care, management and safe handling, disease prevention and control, routine care, preventive care, emergency care, veterinary treatment, and disaster planning, evacuation, and recovery that are applicable to the location of the pet boarding facility.

    (e)    Ensure that each sick or injured pet is immediately provided with appropriate care and, if prudent, veterinary treatment.

    (f)    Ensure that the owner of a pet is notified immediately that his or her pet.is sick or injured unless the owner has indicated writing that notification of any, or a particular type, of illness or injury is not required.

113.    Moreover, Chapter 11 of the California Health & Safety Code[9] governs "Pet Boarding Facilities," and imposes the following additional requirements on Wag and other pet boarding facilities:

- "pests do not inhabit any part of the pet boarding facility in a number large enough to be harmful, threatening, or annoying to the pets." Cal. Health Civ. Code § 122381(b).

- "pet boarding facility's interior building surfaces, including walls and floors, are constructed in a manner that permits them to be readily cleaned and sanitized." Cal. Health Civ. Code § 122381(e).

- "separating the grooming work area from the pet boarding facility's permanent or fixed and temporary enclosures and ensuring that the grooming areas are cleaned and sanitized at least once daily." Cal. Health Civ. Code § 122381(g).

---

[9] Cal. Health Civ. Code § 122380—122388.

114.     The California Health & Safety Code also imposes additional requirements on "permanent or fixed enclosures,"[10] like the "rooms" and "suites" offered by Wag. The statute requires that these structures:

- "[b]e maintained in good repair to protect the enclosed pet from injury, to contain the pet, to keep other animals out, and to promote the health and well-being of the pet." Cal. Health Civ. Code § 122382(a)(1).

- "[b]e maintained in a comfortable and sanitary manner. When being cleaned in a manner or with a substance that is or may be harmful to a pet within the enclosure, that pet shall be removed from the enclosure." Cal. Health Civ. Code § 122382(a)(1).

- "[b]e constructed of material suitable for regular cleaning and sanitizing." Cal. Health Civ. Code § 122382(a)(3).

115.     Furthermore, several California counties in which Wag facilities are located have implemented ordinances reaffirming the California Health & Safety Code or imposing additional pet welfare standards.[11]

116.     San Mateo County, which houses Wag's Redwood City facility, enacted an ordinance governing the requirements for "kennel" and "cattery" permits. The ordinance covers large commercial boarding operations, like Wag.[12] According to the statute, a kennel or cattery permit may be approved only if the following criteria are met:

- "[t]hat facilities exist at the proposed location to safely and adequately secure, feed, house, exercise and maintain the animals." § 6.20.060(a)(1).

---

[10] The statute defines "permanent or fixed enclosures" as a "structure, including, but not limited to, an exercise run, kennel, or room, used to restrict a pet, that provides for the effective separation of a pet from the pet's waste products."

[11] *See* Los Angeles County, California, Municipal Code § 10.40.010 (imposing numerous sanitation, safety, and welfare related requirements on persons who operate "animal facilities" and noting that the violations of these standards could constitute a misdemeanor); Santa Clara County, California, Municipal Code § 6.35.030 (imposing numerous sanitation, safety, and welfare related requirements on "animal facilities"); Sacramento County, California, Municipal Code § 8.26.075 ("[t]he Chief of Animal Control shall, with the approval of the Director, set minimum standards for the proper care and maintenance both of a kennel or cattery or a place of keeping of wild animals and of the animals kept therein which are, at a minimum, consistent with applicable State and Federal standards."); Alameda County, California, Municipal Code § 5.24.120 ("Every dog kennel shall be maintained in a manner satisfactory to the county health officer.").

[12] Regulations for Kennels/Catteries, County Ordinance Code Title 6 Animals Chapter 6.20 Kennels/Catteries, https://www.smcgov.org/media/73256/download?inline=.

---

- "[t]hat possession and maintenance of the animals at the proposed location will not result in the animals being subject to discomfort, neglect, suffering, cruelty, or abuse." § 6.20.060(a)(4).

- "[t]hat the permit holder agrees to make every effort to keep all animals free of disease and parasites and provide adequate veterinary care as needed." § 6.20.060(a)(5).

- "[t]hat the keeping of the animals at the facility will not violate any federal, state or local law." § 6.20.060 (a)(7).

117.    Similarly, Wag's conduct also violated the state laws of Colorado, Illinois, and Texas, in which it operates pet boarding facilities. For example, Wag violated C.R.S. 35-80-108 which makes it unlawful in Colorado for a pet boarding facility to make false representations.

118.    Wag's conduct is inconsistent with the pet welfare standards set forth by state and local authorities for persons or entities operating commercial boarding facilities.

**Fed. R. Civ. P. 9(b) Allegations**

119.    Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

120.    **WHO**: Defendant made material false representations of fact in its advertising of the pet boarding and daycare services by making claims of their high quality services including safe and sanitary environments for the pets and well trained and equipped staff, when in fact its facilities were understaffed, overpopulated, and incapable of providing the luxury care for pets as advertised.

121.    **WHAT**: Defendant's conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the pet boarding and daycare services would provide their animals with safe, competent, and luxury care.  Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions.  Yet, Defendant has falsely advertised that it provides clean, safe, sanitary, luxurious care at its facilities.

122.    **WHEN**: Continuously throughout the statutory period, Defendant falsely represented its pet boarding and daycare services by making false claims about the safety and

quality of Wag's services when in fact that Wag Hotels is actually incapable of providing an elite standard of care for animals.

123.    **WHERE**: Defendant's false representations were made throughout its own marketing materials on its website and Instagram pages for Defendant's Hotel Stays, and additionally in person at each Wag Hotel facility, and were thus viewed by every purchaser, including Plaintiffs, at the point of sale in every transaction.  The Hotel Stays are sold in brick-and-mortar Wag Hotel facilities and online at waghotels.com.

124.    **HOW**: Defendant falsely represented its boarding and daycare services by falsely advertising that Wag Hotels was capable of providing, and did provide, an elite standard of care for animals, when it did not and could not.  And as discussed in detail throughout the Complaint, Plaintiffs and Class Members read and relied on Defendant's false representations before purchasing the Hotel Stays for their pets.

125.    **WHY**: In making the false representations about the safety and quality of its services, Defendant falsely advertised that the Hotel Stays at Wag Hotels are capable of providing and would provide an elite standard of care for animals, when they are not and did not, for the express purpose of inducing Plaintiffs and Class Members to purchase the Hotel Stays at a substantial price premium or more than they would have paid had they known the truth about the Wag Hotels and Hotel Stays.  As such, Defendant profited by selling the Hotel Stays to at least thousands of consumers throughout California and nationwide, including Plaintiffs and the Class Members.

**CLASS ACTION ALLEGATIONS**

126.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1)-(3) on behalf of a nationwide class as follows:

> **All persons who used Wag's services within the last four years (the Class).**

127.    Additionally, Plaintiffs seek certification of a California subclass defined as follows:

> **All persons who used Wag's services within the State of California within the last four years (the California Subclass).**

128.    Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

129.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1)-(3).

130.    <u>Numerosity.</u> The Class and California Subclass are so numerous that the individual joinder of all members is impracticable, and the disposition of the claims of all Class and California Subclass members in a single action will provide substantial benefits to the parties and the Court. Plaintiffs, on information and belief, allege that the Class and California Subclass include at least thousands of persons.

131.    <u>Commonality.</u> Common legal and factual questions exist that predominate over any questions affecting only individual Class and California Subclass members. These common questions, which do not vary among Class or California Subclass members and which may be determined without reference to any member's individual circumstances, include, but are not limited to:

a)    Whether Wag owed a duty of care to its customers and their pets;

b)    Whether Wag breached its duty of care to its customers by failing to implement policies and procedures to ensure the welfare of customers' pets;

c)    Whether Wag had knowledge of the abuse and neglect at its California and nationwide facilities;

d)    Whether Wag's representations and omissions in its advertising are false, deceptive, and misleading;

e)    Whether Wag had knowledge that its representations and omissions in its advertising were false, deceptive, and misleading;

f)    Whether Wag's representations and omissions in its advertising are likely to deceive a reasonable consumer;

g) Whether Wag knew or should have known that reasonable consumers rely on its representations concerning safety and general pet welfare to purchase its services;

h) Whether Wag engaged in unlawful, fraudulent, or unfair business practices;

i) Whether Wag's conduct violated the applicable California consumer protection laws alleged herein;

j) Whether Wag is subject to liability for violating the California False Advertising Law ("FAL") Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

k) Whether Wag has violated the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

l) Whether Wag is subject to liability for violating the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*;

m) Whether Wag's representations were likely to deceive a reasonable consumer.

n) Whether Wag's omissions were likely to deceive a reasonable consumer.

o) Whether Wag advertised its services (including rooms, staff-training, group-play, personalization, and health and safety), with the intent not to sell them as advertised.

p) Whether Wag made and breached express or implied warranties to Plaintiffs and Class and California Subclass members about its services.

q) Whether Wag was unjustly enriched based upon its misrepresentations.

r) Whether Plaintiffs and Class and California Subclass members were harmed as a result of Wag's misrepresentations.

s) Whether Plaintiffs and Class and California Subclass members are entitled to restitution and damages, and

t) Whether Plaintiffs and Class and California Subclass members and are entitled to declaratory and injunctive relief.

132.   <u>Typicality.</u> Plaintiffs' claims are typical of the Class and California Subclass members' claims. As a result of Wag's misconduct and neglect at its facilities, Wag's conduct exposed Plaintiffs and the Class and California Subclass members to the same harm or risk of future harm. Likewise, Plaintiffs and other Class and California Subclass members must prove the same facts—Wag's unlawful conduct at its facilities—in order to establish the same claims.

133.   <u>Adequacy.</u> Plaintiffs are adequate Class and California Subclass representatives because they are member of the Class and California Subclass, and their interests do not conflict with the interests of the Class and California Subclass. Plaintiffs have retained counsel competent and experienced in complex litigation and consumer protection class action matters such as this action, and Plaintiffs and their counsel intend to prosecute this action for the benefit of the Class and California Subclass and have the resources to do so. Plaintiffs and their counsel have no interests adverse to those of the other members of the Class and California Subclass.

134.   <u>Predominance and Superiority.</u> The Class and California Subclass can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class and California Subclass members. A class action is also superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of each Class and California Subclass member's claim is impracticable. Even if each Class and California Subclass member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceeded. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those individuals with equally meritorious claims. It would increase the expense and delay to all parties and the Courts because it requires individual resolution of common legal and factual questions. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**Negligence**
*On Behalf of Plaintiffs and the Class*

135.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of the Class against Wag.

136.    By accepting the obligation to care for and oversee the welfare of Plaintiffs' and the Class members' pets, Wag assumed a duty requiring it to use reasonable, and, at the very least, industry-standard care to ensure the safety and well-being of customers' pets. This duty included, *inter alia*, maintaining a clean and sanitized environment for pets; ensuring that its facilities were adequately staffed; providing adequate training to staff members on proper techniques for animal care; creating an environment free of safety and health hazards.

137.    Wag's duty of care also arose by statute and local regulations, including, as alleged herein, violations of California's health code for pet boarding facilities (Cal. Health Civ. Code § 122380—122388) and violations of local health and safety ordinances in the cities and counties in which Wag operates its facilities. These state statutes and local ordinances were enacted to protect Plaintiffs' and Class members' pets from the type of conduct engaged in by Wag.

138.    Wag breached its duty to exercise reasonable care in overseeing and providing for Plaintiffs' and the Class members' pets by failing to implement the policies, procedures, and general oversight measures required to ensure the safety and well-being of customers' pets. Wag breached its duty by maintaining facilities that were unsanitary, understaffed, and under resourced. Wag's conduct created a foreseeable and unreasonable risk of harm to Plaintiffs' and Class members' pets (and injury and damages to their owners).

139.    As a direct and proximate result of Wag's failure to take reasonable care and use, at a minimum, industry-standard measures to take care of and ensure the well-being of the pets in its care, Plaintiffs and the Class members experienced harm in the form of out-of-pocket medical expenses for their pets and the overpayment of services based on Wag's misrepresentations.

140. Wag's negligence was gross, willful, wanton, and warrants the imposition of punitive damages given the clear foreseeability of the severe physical and psychological harm to pets, the substantial injury to the pets' owners, and its failure to take remedial actions.

141. Plaintiffs and Class members are entitled to compensatory and punitive damages, as well as injunctive relief to remedy Wag's ongoing neglect and abuse.

**SECOND CLAIM FOR RELIEF**
**Negligent Misrepresentation**
*On Behalf of Plaintiffs and the Class*

142. Plaintiffs, individually and on behalf of the Class, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of the Class against Wag.

143. Defendant omitted, failed to disclose, and intentionally concealed material facts concerning the standard of care and services provided to pets staying at Wag Hotels. Wag made false representations both in its advertisements and in statements directly to customers about the nature and quality of its services.

144. At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

145. Defendant negligently misrepresented and/or negligently omitted material facts about their boarding and daycare services and the associated risks.

146. Plaintiffs and Class members would not have purchased Wag's services or would have paid far less had the true facts been known.

147. Defendant's negligent misrepresentations harmed Plaintiffs, the Class, and their pets. Plaintiffs and the Class are entitled to damages and other legal and equitable relief.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment/Restitution**
*On Behalf of Plaintiffs and the Class*

148. Plaintiffs, individually and on behalf of the Class, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as

if fully set forth herein. Plaintiffs bring this claim individually and on behalf of the Class against Wag.

149.    Plaintiffs and the Class conferred benefits on Defendant by purchasing the Hotel Stays.

150.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of the Hotel Stays.  Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that it was actually incapable of providing an elite standard of care for animals as advertised, rendering them unfit for their intended purpose.  Those omissions caused injuries to Plaintiffs and Class members because they would not have purchased the Hotel Stays for their pets if the true facts were known.

151.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class for it unjust enrichment, as ordered by the Court.

152.    Defendant omitted, failed to disclose, and intentionally concealed material facts concerning the standard of care and services provided to pets staying at Wag Hotels. Wag made false representations both in its advertisements and in statements directly to customers about the nature and quality of its services.

153.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

154.    Defendant negligently misrepresented and/or negligently omitted material facts about its boarding and daycare services and the associated risks.

155.    Plaintiffs and Class members would not have purchased Wag's services or would have paid far less had the true facts been known.

156.    Defendant's negligent misrepresentations harmed Plaintiffs, the Class, and their pets. Plaintiffs and the Class are entitled to damages and other legal and equitable relief.

**FOURTH CLAIM FOR RELIEF**
**Violation of the "Unfair" Prong of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
***On Behalf of Plaintiffs and the California Subclass***

157.    Plaintiffs, individually and on behalf of the California Subclass, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of the California Subclass against Wag. Wag's conduct as alleged in this complaint comprises unfair conduct within the meaning of the California Unfair Competition Law.

158.    The UCL is a California statute that protects consumers against unlawful, unfair, misleading, and fraudulent business and advertising practices.

159.    Wag's actions as alleged herein constitute "unfair" conduct within the definition, meaning, and construction of California Business and Professions Code Sections 17200 *et seq.* Wag's business practices, as alleged herein, are "unfair" because they subject pets to immoral, unethical, and oppressive conditions that cause substantial injuries to Plaintiffs and California Subclass members.

160.    Wag's "unfair" business practices include:

    a)    Creating conditions that caused customers' pets to contract serious medical illnesses and life-threatening health conditions;

    b)    Maintaining extremely unsanitary and unsafe conditions for consumers' pets;

    c)    Maintaining boarding facilities that were grossly understaffed and thus unable to provide proper care to customers' pets;

    d)    Failing to provide adequate training to employees concerning animal behavior and animal care; and

    e)    Maintaining the above-mentioned unsanitary and unsafe conditions at its facilities to save money, cut costs, and increase profits.

161.     As a result of Wag's unfair conduct, Plaintiffs and the California Subclass received inferior services than which they were promised. Wag did not have the policies or resources to provide a clean, safe, and attentive environment for customers' pets.

162.     Wag's conduct provided no utility to Plaintiffs and Class members. Rather, Wag could and should have chosen one of the many reasonably available alternatives, including providing adequate staffing, training, and resources to maintain a safe and sanitary environment for the pets under its care.

163.     Pursuant to Business and Professions Code Section 17200 *et seq.*, Wag's conduct constitutes "unfair" competition. Plaintiffs and the California Subclass seek restitution and equitable relief, including a public injunction to reform Wag's safety and sanitation practices to conform with industry standards and state and local laws.

### FIFTH CLAIM FOR RELIEF
**Violation of the "Unlawful" Prong of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
***On Behalf of Plaintiffs and the California Subclass***

164.     Plaintiffs, individually and on behalf of the California Subclass, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of the California Subclass against Wag. Wag's conduct as alleged in this complaint comprises unlawful conduct within the meaning of the California Unfair Competition Law.

165.     The UCL is a California statute that protects consumers against unlawful, unfair, misleading, and fraudulent business and advertising practices.

166.     Wag's actions as alleged herein constitute an "unlawful" practice within the definition, meaning, and construction of California's UCL because Wag violated California's strong consumer protection and false advertising laws, including California's False Advertising Law (Bus. & Prof. Code §§ 17500 *et seq.*) and the CLRA (Civ. Code §§ 1750 *et seq.*).

167.     Wag's conduct also violates Chapter 11 of the California Health & Safety Code, which establishes standards for pet boarding facilities operating in California and imposes obligations on such companies to maintain safe and sanitary facilities.

---

168.    Wag's conduct violates numerous local ordinances in California governing the standards for commercial boarding facilities, including San Mateo County, California, Municipal Code § 6.20.060; Los Angeles County, California, Municipal Code § 10.40.010; Santa Clara County, California, Municipal Code § 6.35.030; Sacramento County, California, Municipal Code § 8.26.075; and Alameda County, California, Municipal Code § 5.24.120.

169.    As a result of Wag's unlawful conduct, Plaintiffs and the California Subclass received inferior services than which they were promised. Wag did not have the policies or resources to provide a clean, safe, and attentive environment for customers' pets.

170.    Pursuant to Business and Professions Code Section 17200 *et seq.*, Wag's conduct constitutes "unlawful" competition. Plaintiffs and the California Subclass seek restitution and equitable relief, including a public injunction to reform Wag's safety and sanitation practices to conform with industry standards and state and local laws.

**SIXTH CLAIM FOR RELIEF**
**Violation of the "Fraudulent" Prong of The California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
***On Behalf of Plaintiffs and the California Subclass***

171.    Plaintiffs, individually and on behalf of the California Subclass, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of the California Subclass against Wag. Wag's conduct as alleged in this complaint comprises fraudulent conduct within the meaning of the California Unfair Competition Law.

172.    The UCL is a California statute that protects consumers against unlawful, unfair, misleading, and fraudulent business and advertising practices.

173.    Wag's actions as alleged herein constitute a "fraudulent" practice because, by making false and misleading representations about its dedication to pet welfare, Wag's conduct was likely to deceive, and did deceive, reasonable consumers into purchasing Wag's services and trusting Wag to care for their pets.

174.    As a result of Wag's fraudulent conduct, Plaintiffs and the California Subclass received inferior services than which they were promised. Wag did not have the policies or

resources to provide a clean, safe, and attentive environment for customers' pets, and the company's pet welfare representations were the sole reason consumers initially purchased and continued to purchase Wag's services.

175.     Pursuant to Business and Professions Code Section 17200 *et seq.*, Wag's deceitful business practices constitute "unfair" competition. Plaintiffs and the California Subclass seek restitution and equitable relief, including a public injunction to reform Wag's safety and sanitation practices to conform with industry standards and state and local laws and changes and disclosures to Wag's advertising to the public.

**SEVENTH CLAIM FOR RELIEF**
**Violations of the California False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
***On Behalf of Plaintiffs and the California Subclass***

176.     Plaintiffs, individually and on behalf of the California Subclass, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of the California Subclass against Wag. Wag's conduct as alleged in this complaint comprises unlawful conduct within the meaning of the California False Advertising Law.

177.     Wag engaged in the advertising and marketing alleged herein with the intent to directly or indirectly influence the sale of Wag's services to customers, including Plaintiffs.

178.     Wag knew or should have known that its representations assuring consumers of its dedication to pet welfare were likely to deceive a reasonable consumer purchasing its services.

179.     Wag's representations were false, misleading, and deceptive in violation of the California False Advertising Law.

180.     Wag's deceitful business practices constitute false advertising. Plaintiffs and the California Subclass to seek equitable relief under the California False Advertising Law. Plaintiffs and the California Subclass seek restitution and equitable relief, including a public injunction to reform Wag's safety and sanitation practices to conform with industry standards and state and local laws and changes and disclosures to Wag's advertising to the public.

**EIGHTH CLAIM FOR RELIEF**
**Violations of the Consumers Legal Remedies Act**
**Cal. Civ. Code §§ 1750 *et seq.***
*On Behalf of Plaintiffs and the California Subclass*

181.    Plaintiffs, individually and on behalf of the California Subclass, incorporate by reference all the allegations contained in the preceding paragraphs of this Consolidated Class Action Complaint as fully set forth herein. Plaintiffs bring this claim individually and on behalf of the California Subclass against Wag.

182.    The Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.,* is a California statute enacted to protect consumers involved in a transaction against unfair and deceptive business practices.

183.    Wag is a "person" under Cal. Civ. Code § 1761(c).

184.    Plaintiffs and the California Subclass are "consumers" under Cal. Civ. Code § 1761(d).

185.    Wag's acts and practices were intended to and did result in the sale of pet boarding services to Plaintiffs and California Subclass members in violation of Cal. Civ. Code § 1770, including:

      a)  Representing that goods or services have characteristics that they do not have;

      b)  Representing that goods or services are of a particular standard, quality, or grade when they were not;

      c)  Advertising goods or services with intent not to sell them as advertised; and

      d)  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

186.    Wag's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of safety and sanitation practices for pets.

187.    Wag intentionally provided Plaintiffs and the California Subclass with products containing misrepresentations related to the company's practices concerning sanitation, safety, and pet welfare.

---

188.   Plaintiffs and the California Subclass relied on Wag's representations in purchasing the company's services.

189.   As a result of Wag's conduct, Plaintiffs and the California Subclass received an inferior service from that which they were promised.

190.   Plaintiffs, individually and on behalf of the California Subclass, demand judgment against Wag under the CLRA for declaratory and injunctive relief.

191.   Plaintiffs, on behalf of themselves and the California Subclass, further seek an order enjoining Wag's unfair or deceptive acts and practices, court costs, and attorneys' fees under Cal. Civ. Code § 1780(e).

192.   Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs Wisdom and Shelton served Defendant with notice of its alleged violations of the CLRA by certified mail return receipt requested March 12, 2024. This notice was also emailed on March 1, 2024. Plaintiff Piper served Defendant with notice of its alleged violations of the CLRA by certified mail return receipt requested September 11, 2023. Because Wag failed to remedy its unlawful conduct within the requisite time period, Plaintiffs and the California Subclass seek compensatory damages and relief to which they are entitled.

193.   Pursuant to §1780(d) of the CLRA, attached is the Declaration of Amber L. Schubert providing that this action has been commenced in the proper forum.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and California Subclass, request that the Court order the following relief and enter judgment against Wag as follows:

A.   An Order certifying the proposed Class and California Subclass under Rule of Civil Procedure 23;

B.   An Order appointing Plaintiffs and their counsel to represent the Class and California Subclass;

C.   A declaration that Wag engaged in the illegal conduct alleged herein;

D.   An Order that Wag be permanently enjoined from its improper activities and conduct described herein and directing Wag to comply with state and local laws governing animal welfare;

E.   An order awarding Plaintiffs restitution and compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

F.   An order awarding punitive damages as allowed by law in an amount to be determined at trial;

G.   An Order awarding Plaintiffs and the Class and California Subclass reasonable litigation expenses, costs, and attorneys' fees;

H.   An Order awarding such other injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs and the Class and California Subclass; and

I.   An Order awarding such other and further relief as the Court deems necessary, just, and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims and issues so triable.

Dated: June 14, 2024

/s/ Amber L. Schubert
Robert C. Schubert (No. 62684)
Amber L. Schubert (No. 278696)
Daniel L.M. Pulgram (No. 354569)
**Schubert Jonckheer & Kolbe LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
aschubert@sjk.law
dpulgram@sjk.law

1    Dated: June 14, 2024                    */s/ L. Timothy Fisher*
2                                            L. Timothy Fisher (No. 191626)
     Brittany S. Scott (No. 327132)
3                                            Jenna L. Gavenman (No. 348510)
     **Bursor & Fisher, P.A.**
4                                            1990 North California Blvd., Suite 940
     Walnut Creek, CA 94596
5                                            Tel: (925) 300-4455
     Fax: (925) 407-2700
6                                            ltfisher@bursor.com
     bscott@bursor.com
7                                            jgavenman@bursor.com
8
9                                            *Co-Interim Class Counsel*
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28